**SO ORDERED.**

**SIGNED this 18 day of October, 2007.**



_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE
_____

OPINION DESIGNATED FOR ON-LINE PUBLICATION
BUT NOT PRINT PUBLICATION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CAMPBELL SOD, INC., | ) | Case No. 06-11820 |
| | ) | Chapter 12 |
| Debtor. | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | |
| ARTHUR L. CAMPBELL, | ) | Case No. 06-11717 |
| | ) | Chapter 12 |
| Debtor. | ) | |
| | ) | |

## MEMORANDUM OPINION

Before the Court are several issues in these jointly administered Chapter 12 cases.[1]  The

---

[1] Dkt. 88 (Case No. 06-11820). Unless otherwise noted, all docket entry references are to Case No. 06-11820.

1

debtors seek confirmation of their combined chapter 12 plan of reorganization dated March 1, 2007.[2] They also seek leave to borrow $200,000 working capital from Irish, L.L.C. and to secure repayment of that post-petition debt with a first security interest in assets (accounts receivable and inventory) they have pledged to their principal lender, First National Bank of Wamego ("Bank").[3] The Bank objects to confirmation and opposes the borrowing.[4] At trial, the Bank announced that it believed the debtors could confirm a feasible plan even without the proposed borrowing. Also pending in this matter is the combined debtors' objection to the Bank's claim. For purposes of this hearing, however, the parties stipulated to the allowance of the Bank's secured claim in the amount of $1,595,000, deferring claims allowance to another hearing.

At trial, debtor Arthur L. Campbell was represented by Bruce J. Woner. Debtor Campbell Sod, Inc. was represented by Edward J. Nazar. First National Bank of Wamego appeared by Thomas J. Lasater. The Chapter 12 trustee Eric Rajala also appeared.

The Court has twice heard testimony in support of the borrowing motion.[5] In addition, on August 29, 2007, the Court heard evidence in support of confirmation of debtors' plan. Having carefully considered the record in this case, the Court is ready to rule.[6]

---

[2] Dkt. 97.

[3] Dkt. 120.

[4] Dkt. 109 and 125.

[5] The first hearing on the debtors' credit motion under § 364 was conducted on June 27, 2007. *See* Dkt. 128.

[6] This Court has jurisdiction pursuant to 28 U.S.C. § 157(a) and §§ 1334(a) and (b) and the Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's Bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective July 10, 1984. The confirmation of a chapter 12 plan and a motion to

2

Case 06-11820    Doc# 164    Filed 10/18/07    Page 2 of 12

General Facts

Arthur L. Campbell ("Campbell") owns most of the capital stock of Campbell Sod, Inc. ("CSI"). As its name suggests, CSI grows and sells sod for golf courses, residential developments, and to stores for resale. CSI owns all of the rolling stock and inventory used or consumed in the sod business. With his wife's revocable trust, Campbell owns the land near Rossville, Kansas, where CSI operates. Campbell is the principal officer of the company. The Bank holds mortgages on the land and a perfected security interest in the personal property of the company. The Campbells have personally guaranteed repayment of CSI's debt. Both debtors have employed Bob Unruh, a former banker, as a financial and business consultant.

For the purposes of the immediate controversies, the parties have stipulated that the debtors owe the Bank $1.595 million. The debtors have objected to the Bank's claim, but this objection appears directed at liquidating an amount and is not an attack on the validity or enforceability of the Bank's debt. The Court concludes that the value of the Bank's collateral ranges from $1.735 million (based on the plan liquidation analysis) to as much as $2.053 million (based on the most recent appraisal values). The parties agree that in either scenario, the Bank is oversecured. As much as $231,836 of the value is composed of accounts receivable. According to the accounts receivable aging summary introduced into evidence as Exhibit 16, most of these receivables are current to 60 days old.[7] The values suggested in the debtors' plan include vehicles and equipment that are

---

approve borrowing under 11 U.S.C. § 364(d) are core proceedings which this Court may hear and determine as provided in 28 U.S.C.§ 157(b)(2)(D) and (L). There is no objection to venue or jurisdiction over the parties.

[7] The Court notes with some bemusement that the accounts receivable aging report does not "foot;" in other words, the totals for current ($31,478), 1-30 days ($138,805), 31-60 days

3

pledged to other creditors. The only valuation evidence of any kind is a fee appraisal of the land offered at the August trial and the general testimony of Campbell at the first borrowing hearing in June.

The Court calculates that, based on the values set out on the balance sheet of CSI, reducing them by the amounts of the prior liens on vehicles and equipment, and reducing the value of the accounts to the sum of those of current to 60-day vintage, CSI's personal property assets in which the Bank claims an interest (and to which Irish, L.L.C. would prime the Bank to the extent of $200,000), is $936,908.[8] After considering the results of the real estate appraisal provided by Michael Pearl, the Court concludes that Campbell's real estate assets pledged to the Bank are valued at $1.116 million[9], making the Bank's total collateral package worth $2,053,687 and yielding an equity cushion of some $458,687.

The Court notes that, under the liquidation analysis values presented by the debtors in their combined plan in March of 2007, the Bank's equity cushion is less than $200,000, the amount of the requested new borrowing. Given the values testified to at the confirmation hearing, the Bank's equity cushion is substantially greater – $458,687. The Court places greater weight on these values because they are, in part, supported by a fee appraisal and live testimony. Other than Campbell, no other live witness has testified to the value of any asset. The parties stipulated to the admission of

---

($14,784), 61-90 days ($25,394), and over 90 days ($3,594) does not add up to the total amount of $231,836. Nevertheless, as the parties appear satisfied with the ultimate amount, the Court will assume the total value of receivables is as represented on the debtor's financial statement.

[8] *See* Exhibit 3 and Exhibit 16.

[9] Pearls' appraisal valued 3 tracts of real estate at $1,173,000. *See* Exhibit 17. However, Frontier Farm Credit has a claim in the amount of $56,221 secured by a first mortgage on Tract 3. *See* Dkt. 97. This leaves a value of $1,116,779 for the Bank.

4

the Michael Pearl real estate appraisal, but the Court did not have the opportunity to hear Mr. Pearl testify or be cross-examined. All of the other values were derived from the financial statements of Campbell and CSI or from Bob Unruh's calculations. Only because the parties appear somewhat comfortable with these valuations, will the Court rely on them.

Facts Regarding Feasibility

The debtors' plan contemplates an internal refinancing of the company's operations with the injection of $200,000 to be borrowed from Irish, L.L.C. and secured by a first lien on all the debtors' non-real estate assets. The Irish debt would be repaid in monthly payments over five years at the premium interest rate of 15 per cent per annum. Under the plan terms, Arthur Campbell's real estate obligation to the Bank will be repaid over seven years on a thirty-year amortization at 7 per cent interest and a balloon payment on the eighth anniversary of approximately $993,000. The Court observes that this will represent a $100,000 reduction in principal over the seven years' period. No evidence is before the Court bearing on how Campbell intends to pay the balloon. CSI's equipment loan of $448,596 will be repaid over the same seven years in semi-annual instalments at the same interest rate.

According to Bob Unruh's testimony and work papers, the debtors are projected to clear about $136,000 through August of 2007.[10] This projection *includes* the $200,000 infusion. Reviewing the cash flow detail to Exhibit 2, found in Exhibit 1, the Court notes that by year's end 2007, the cash surplus will be $125,281. Debtors project a cash flow of $74,961 after debt service for the year 2008, $172,258 for 2009, and $347,319 for 2010.[11] They also project substantially

---

[10] Exhibit 2.

[11] Exhibit 9.

higher income ($1.3 to 1.6 million) in those years than in prior years. While the Bank effectively cross-examined Mr. Unruh on several line-item details, on the whole, the Court concludes that the projections offered are based on acceptable assumptions and do not beggar credibility.

Analysis

To resolve the present controversy, the Court must first consider whether the plan is feasible; in other words, the Court must determine whether the debtors will be able to make all of the payments under the plan as required by § 1225(a)(6). Then, the Court must determine whether the proposed capital financing may be approved under § 364(d). This requires consideration not only of the underlying plan's feasibility, but also of whether the Bank's interest can be adequately protected. In framing the issues thus, the Court notes that the Bank's objections to confirmation assert numerous other issues under § 1225(a)(5), but that none of these issues was addressed at confirmation. The Court understands the parties to have reached an understanding on all of these other issues and deems them abandoned at trial, leaving it to the Court to determine the feasibility and adequate protection issues today.

1. Section 1225(a)(6): Feasibility

It is clear from the evidence offered at both the June 27 hearing and the August 29 confirmation hearing that CSI's plan will not cash flow without the $200,000 capital advance to be obtained from Irish LLC. The plan is not feasible without it. While the cash flows offered at the respective hearings covered different time periods, reducing cash by $200,000 in either results in negative cash projections on the bottom line. It also appears that what the debtor anticipates grossing in 2008 and years beyond is substantially more than this debtor has grossed since 2004. Indeed, in 2006, the debtor actually grossed less than a million dollars while now it projects a gross

6

for calendar year 2008 of $1.383 million, following on a gross for the current year 2007, based on a combination of the first eight months' actual results and the debtor's projection for the balance of the year, of approximately $1.271 million.[12] Exhibit 2, the cash flow summary for the remaining months of 2007, includes the contemplated $200,000 advance.

Based upon the Court's review of Exhibit 14, Unruh's narrative of the production costing of sod, the Court is reasonably comfortable in finding that the debtor can generate sufficient cash flow to cover the difference between the total "production cost" of .87 cents per yard for 205 acres and the $200,000 advance, should it be approved. The Court is persuaded, in the absence of any contrary evidence, that seeding cost runs .17 cents a yard, while growing cost is about .075 cents per yard. There are 4,840 yards in an acre and 205 acres to be cultivated. The seeding and growing costs will amount to well in excess of $200,000. If 992,200 yards of sod are planted at a total production cost of .87 cents per yard, the entire cost will exceed $863,000, meaning that after expending the $200,000 in advanced working capital, the debtor will need to cash flow from current operations the other $663,000. Looking at Exhibit 2 and, in particular, the "business only" actuals for prior years, it is very difficult to determine how much was expended on seeding and growing costs, but it is easy to see that in each of the three prior years, operating expenses exceeded $1.0 million even though not all the acreage was planted, with losses that did not exceed ($79,000). This suggests that the additional $663,000 in necessary production cost is not out of reach and that the plan could be feasible, assuming that the court would approve the $200,000 credit advance and accompanying subordination of the Bank's liens.

    2.    <u>Section 364(d): The Priming Lien and Adequate Protection</u>

---

[12] *See* Exhibit 2 and Exhibit 9.

Determining whether the Bank's lien may be subordinated under § 364(d) hinges on whether the Bank's secured position at the date of filing can be protected if the Bank's lien is subordinated to accommodate the post-petition lender here. Section 364(d) states –

> (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if--
>     (A) the trustee is unable to obtain such credit otherwise; and
>     (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
> (2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.[13]

The principal considerations before the Court are, therefore whether (1) the debtor was unable to obtain this credit on another basis and (2) whether the proposed loan and subordination of the existing lender's liens can be made while protecting the existing lender's interests.

In this case, the parties agree that the only source of credit is Irish LLC on the terms proposed. This focuses us on adequate protection. Courts wrangling with these cases look to the definition of adequate protection found in § 361. Adequate protection can be one, or a combination of these elements: (1) cash payments to compensate a creditor for a decrease in his collateral value; (2) an additional or replacement lien; or (3) some other provision to assure the secured creditor the indubitable equivalent of his interest.[14] A sufficient equity cushion may constitute adequate protection.[15] Adequate protection is designed to preserve the pre-petition position of the existing

---

[13] 11 U.S.C.A. § 364

[14] 11 U.S.C. § 361.

[15] *In re Stanley Hotel, Inc.,* 15 B.R. 660, 664 (D. Colo. 1981).

8

lender.[16] As one court has put it,

> . . . the proposal should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing. *In re Swedeland Development Group, Inc*., 16 F.3d 552, 564 (3rd Cir. 1994). A finding of adequate protection should be premised on facts, or on projections grounded on a firm evidentiary basis. *In re Mossello*, 195 B.R. 277, 292 (Bankr. S.D. N.Y. 1996). Congress did not contemplate that a secured creditor could find its position eroded and, as compensation for the erosion, be offered an opportunity to recoup dependent upon the success of a business with inherently risky prospects. *Swedeland Development Group,*, 16 F.3d at 567. The authorization to prime an existing lien should not be read as authorization to increase substantially the risk of the existing lender in order to provide security for a new, post-petition lender. When the effect of the new borrowing with a senior lien is merely to pass the risk of loss to the holder of the existing lien, the request for authorization should be denied. 3 Collier on Bankruptcy ¶ 364.05[1] (15th Ed. Rev'd). The burden is on the movant to prove that existing lienholders are adequately protected. 11 U.S.C. § 364(d)(2).[17]

Another court has suggested a "holistic" approach to determining whether adequate protection is offered. This approach requires a valuation of the collateral of the existing lender, the likelihood of its depreciating or appreciating over time, the prospects that the reorganization contemplated by the debtor will be successful and the debtor's performance in accordance with the plan.[18] As to the collateral's value, courts tend to look to the circumstances and vagaries of each case to determine whether liquidation value, going-concern value, or some value in between should be employed.[19] One court has "split the difference" based upon a determination that the debtor might not be able to last much longer, lacked a buyer, and had unfounded business projections to

---

[16] *In re Windsor Hotel, L.L.C.*, 295 B.R. 307, 314 (Bankr. C.D. Ill. 2003).

[17] *Id.*

[18] *In re Aqua Associates*, 123 B.R. 192, 196-97 (Bankr. E.D. Pa. 1991) [citations omitted].

[19] *In re Phoenix Steel Corp.*, 39 B.R. 218 , 224 (D. Del. 1984).

9

shore up its request for a priming lien.[20] The Tenth Circuit has not reported an opinion on the application of § 364(d)(1).

Therefore, this Court is faced with determining whether the proposed financing will leave the Bank with the benefit of its bargain and not result in the diminution of its property interest. There was no evidence at trial concerning the liquidation value of the debtors' assets. Instead, the evidence at trial supports a finding of an equity cushion well in excess of $200,000.

Will the infusion of $200,000 result in the immediate increase of the personal property assets in value by $200,000? This is doubtful. It is hard to fathom that immediately after planting, the seed and growing costs incurred with the $200,000 will increase the value of the sod in the ground by a like amount, bearing in mind that the $1 per yard value attributed to growing sod is an "average" that takes in the value of sod in different stages of development. There is no record to support a conclusion that newly planted sod, i.e. seed in the dirt, is worth a dollar a yard. But this is not the dispositive point. The debtor must convince the Court that it will be in a likely position to repay this loan while servicing the Bank's debt, too.

If the aim is to leave the subordinated Bank in the same position it was prior to subordination, the Court cannot conclude that, on an immediate basis, this will be the case. As noted above, it seems unlikely that a dollar spent planting sod instantly translates to a dollar's worth of sod in the ground, at least until the grass matures to some level. At the same time, the Court cannot say that the Bank's opportunity to recoup is based on a business with "inherently risky prospects." Nor can it be said that the projections offered are not grounded on a firm basis. Nor is the risk of loss passed to the holder of the pre-existing lien. At worst, some $60,000 of the $200,000 subordination

---

[20] *Id.* at 225-26.

10

Case 06-11820   Doc# 164   Filed 10/18/07   Page 10 of 12

is at risk at liquidation, assuming that were to occur immediately after the money was spent and sod planted. Once the sod reaches some level of maturity, the $200,000 investment should equate to $200,000 in value. In so concluding, the Court assumes that a sod crop is not subject to the climactic risks that annually threaten wheat and corn crops.

Possibly the best evidence in support of the motion is contained in Mr. Unruh's projected asset values with the infusion, Exhibit 6. That exhibit illustrates the impact of having all 205 acres in cultivation as opposed to the currently planted 85 acres. According to this analysis, at year's end, the growing sod inventory alone amounts to $992,000. While the $992,200 estimate may be somewhat speculative, the Court concludes that the value of the Bank's collateral package on August 29, 2007 exceeded the liquidation valuation and that the Bank's equity cushion exceeds $200,000. More importantly, the post-petition lender Irish will claim no interest in the real estate that is the bulwark of the Bank's security.

If the Court applies the "holistic" approach, the Bank's collateral sod crop is more likely to increase than to decrease in value. Moreover, the prospects for reorganization do not appear bleak; indeed, the Court has already concluded that the company is unlikely to succeed without some form of capital infusion. Given the strong commitment of the debtor management and the substantial nature of the Bank's collateral package, the Court believes it is likely that the company will succeed, at least for the foreseeable future. Once the sod is planted and reaches some level of maturity, the Bank's personal property collateral package will have more than sufficient value to accommodate the priming loan. The Court acknowledges that the Bank effectively loses the command and control that a first lender seeks, but so long as the value is there to protect the Bank's interests, the borrowing can be approved. But if the Bank seeks to retain that command and control, it is free to

11

do so by providing the needed capital financing itself. At the same time, the Court notes that any further requests for borrowing in the absence of extraordinary circumstances would be viewed as a strong indication that the Court's feasibility conclusions are incorrect and are likely to be viewed with a more jaundiced eye.

The record supports a conclusion that the working capital infusion will result in increased asset value that will adequately protect the Bank, that the effect of this borrowing will not be to pass an unacceptable portion of risk from the new lender to the existing one, and that the borrowing may be approved in the context of confirmation of the plan. Therefore, the Court overrules the Bank's objections to confirmation and grants the debtor's motion for borrowing under § 364(d)(1). The Chapter 12 Trustee may prepare the appropriate confirmation order and this Order shall serve as the order granting the debtor's borrowing motion.

# # #

12

Case 06-11820   Doc# 164   Filed 10/18/07   Page 12 of 12